case. Police report, I'm Philip Keat. I'm here on behalf of Petitioner Terry Williams- Carter, this is a Social Security Administration employee case. Our case depends on two unchallenged propositions. One is that an agency decision can be based only on the reasons set out in the proposal and second that the MSPB decision can be based only on the reasons set out in the agency decision. In this case the deciding official Diana Ellis had only two jobs to do. She didn't have to decide guilt or innocence and she didn't have to decide whether this was really punishable misconduct. Her first job was to decide should this be punished by a two-week suspension, two-month suspension or a discharge or something in between. That was her job. Her other job was to simply state her reasons. This is not a hard thing to do. She was to consider, sit down and consider, all the factors that would distinguish one case from another. Why would you, are there any reasons to make this only a two-week suspension? Are there any reasons to make it a discharge? Think through those. A lot of agencies have checklists based on the doubtless factors. There's a lot of deference under the law paid to the determinations with respect to penalty. So how do you get over, with the fact of this case, how do you get over that hurdle? Because we're not arguing that. We're not asking the court to substitute its judgment. This is like the Ward case. The question is when you look at the record given the reasons relied on by the arbitrator, are they in the decision of Ms. Ellis? And if so, are those factors, those reasons, in the proposal letter? Okay, well on that point I have some familiarity with the Ward case. Seems to me it's kind of an apples and oranges thing. So you can tell me why I'm wrong. But in Ward it dealt with relying on conduct that was never disclosed to the employee. Here it seems to me, reading your argument, we're not talking about he relied on conduct that was not disclosed in the proposal. You're kind of talking about the consequences of what she did. Costs, training. That's point one. And point two is there is a reference to costs and training and those other factors in the notice of termination. So how do you respond to those two arguments? The first one is this. There are reasons. What the court's dealing with and what the Board deals with are the reasons for discharge or suspension. And the issue only arises. Ms. Williams-Carter did a very bad thing and deserved to be punished. So what reasons were not disclosed to her that were relied on by the arbitrator? The reason that she engaged in coercion and intimidation. The reason that she inconvenienced the Commissioner of Social Security. The reason that her conduct resulted in the understaffing for some undisclosed period of time of the Chicago Teleservice Center. Here's what happens, Your Honor. There are statements of facts in the record which would support reasons like that. For example, if Ms. Williams-Carter sent an email to the Commissioner of Social Security, that may have resulted in inconveniencing him. Or it may have been forwarded by a clerk to the Regional Director. If they had said anywhere, you inconvenienced the Commissioner of Social Security, then she would have a chance of refuting that. That's a factual question. Her sending an email to the Commissioner or dealing with the Regional Commissioner may well have been an attempt to coerce and intimidate management. If they had said, we are proposing or deciding to discharge you because what you did, you not only did something dishonest in trying to get this, you also did something really, really bad, which is to engage in coercion and intimidation. There's two ways of getting an objective that she wasn't entitled to. If they had said anywhere, one of the factors we're relying on is the fact that you consciously intended your conduct, not the falsification, but the subsequent conduct, you intended that to result in intimidation and coercion, she would have been able to try to refute it. Same thing under staffing. Every enterprise, certainly an enterprise the size of Social Security, at any given time will have some places, some offices that are understaffed and some are overstaffed. By definition, you can't have optimum staffing at every given time. If they had said, here are the facts, we sent you to training, you weren't entitled to it, took you out of the office for two weeks or two months or whatever, and if they had said a consequence of that was that for some period of time the Teleservice Center was understaffed, that is a valid aggravating factor that changes it from a pure and simple or adds to the consequences of acting dishonestly. Not only did you act dishonestly, but it had the following result. If they had said that, then she would have been able to either admit or refute. And that's the sort of information that we need. So what's referenced, Your Honor, in many of this, are the underlying facts. We sent you to training. That doesn't explain to her that we're firing you in part because doing that had a particular adverse consequence. That's the answer. And they can't, I don't think the agency can properly say, well actually what the agency does say is that for some of this, Ms. Ellis testified at the hearing that these were her reasons. Well, that's exactly what happened in Ward and the subsequent MSPB cases. It's not the fact that the decision letter deviates from the proposal letter. It's that we discover at the hearing or in discovery that the true reasons, the conscious reasons of the decision maker were deviating. But we will agree that in Ward it dealt with considering other instances of conduct. Whereas here you're not talking about other instances of conduct. You're talking about how much in detail you discussed what the potential consequences of what you did are to the agency. No. I'm not missing that decision. Yes or no? No. I'm wrong. You're wrong. Okay. You're right as far as the consequences of understaffing. You're wrong as to the misconduct. On that point though, it seems to me reading the notice of termination, there are no new facts that were disclosed before the arbitrator that weren't outlined to her in the notice, right? The notice outlines in great detail the repetitive contacts and the conduct. And you're arguing about the bottom line in terms of how they might have been described, but you're not arguing that there was conduct that was brought in by the arbitrator that wasn't already outlined in the notice, are you? No, I'm not. But I do think it's highly significant. To engage in coercion and intimidation is a very serious offense. She could be punished for that whether or not she did falsification, and it is totally separate. The understaffing is a consequence of, if it did happen, of her getting the training or moving from office to office. Engaging in intimidation and coercion is a separate punishable offense. It may be that if you add intent to the facts outlined by the agency, that she sent an email, she contacted the regional director, she met with the regional director, it may be that if you add the intent to coerce and intimidate, then you have a punishable offense. But you have to allege that somewhere. It's like the Mets case where the issue is whether the employee threatened and should be fired for threatening. There are facts that have to be proven if you're going to punish somebody for something, and before they're proven, they have to be alleged. And that's what we have on issue after issue here. This is not onerous. An interesting point, Your Honor. The agency's red brief says, Ms. Ellis' reasons included the fact that Ms. Williams-Carter inconvenienced top management. The agency's surreply says the record is replete with statements that Ms. Williams-Carter engaged in coercion and intimidation. That record, they're talking about the proposal letter and the decision letter. I don't think you could have any greater proof that there was not any clear statement of the real reasons for the discharge. If there's no other questions, I reserve the rest of my time.  At page 58 of the appendix, which is part of the notice of proposed removal, the agency went into great detail in the second full paragraph, actually starting at the top of the page, explaining that Ms. Williams-Carter had inconvenienced, actually it says she's exhibited no concern at all that you might have inconvenienced anyone in any of the offices involved in your multiple requests for reassignment. And then in a paragraph down below, the proposing letter basically says, you were fully aware at the time that you contacted, I'm paraphrasing now, the Commissioner of Social Security that your medical documentation was false. She had forged a signature, and yet she contacted the Commissioner. So there was abundant notice in the proposing letter that the agency, that the facts underlying the two charges were that she was inconveniencing many people in many offices, including the Commissioner and other higher level officials of the agency. But isn't that different from coercion and intimidation? Well, I think that, not really, I think what happened was the arbitrator characterized certain events as say coercion or intimidation or the workplace shortage issue, but it means the same thing. The only reason she could possibly have gone to the Commissioner, and she never denied it, was that she was unhappy with the agency's decision to deny the third request for the transfer. And what the agency explained in the proposing letter and then in the notice of decision, but the proposing letter is key because the notice is that this showed an utter lack of respect for other Social Security officials, including the head of the agency and the regional director and other people in the other Social Security offices, the offices from which she transferred and the offices to which she transferred. So that while perhaps the word coercion was not used on page 58, it affected her actions by a second time forging or having someone forge a doctor's signature to try to get this hardship transfer, knowing that what she had done was fraudulent, knowing that the Commissioner, nor did anybody else in the agency know that it was fraudulent, in effect to try to get what she wanted. So that there's actually no basis to the argument that she was not on notice of what it was that the agency had charged. In fact, she didn't contest any of the underlying facts. She really only argued below, as she argues here, that the penalty was too severe. With respect to the workplace shortage on page 54 of the proposing letter, the first full paragraph under Reason 2 basically explains that the first hardship transfer meant that her position from the office where she had been was encumbered, meaning that no one else could be hired for that spot. She received training and mentoring in the new position, which she admitted caused a loss of production. She wasn't performing work when she was being trained for four months. The mentors who were mentoring her were not able to perform work while they were mentoring her. So while the proposing letter doesn't use the term workplace shortage, that's obviously what it is, that's what it means. She had a meaningful opportunity to try to contest that, but in effect she admitted it, ultimately, that the two requests were based upon forged signatures of a doctor. The middle request was based upon false information. So that basically, under Ward, the key is what's in the Notice of Proposed Removal? And this was an eight-page, single-spaced letter that went into great detail about dates, what she did, her misconduct, and the consequences of her misconduct on the agency. And then when it came to the removing letter with Ms. Ellis, Ms. Ellis relied in large part on the proposing letter. That typically happens. And then responded to Ms. Williams-Carter's arguments about the Douglas factors and why Ms. Ellis felt that and believed that. On balance with the Douglas factors, the penalty of removal was the only possible penalty here, given that there was this complete lack of trust. She had lied throughout to many people, her supervisors. She had lied to the Inspector General's investigator. She only admitted the truth once she was kind of caught in the lie. The nature and seriousness of the offense was egregious and horrible. Those were words that Ms. Ellis and Ms. McGee each used. It was just unconscionable that someone in a position of trust dealing with Social Security claimants, as they said a vulnerable part of the population, would lie to this extent to try to get what she wanted. She had contacts with the public. Management could no longer trust her. With respect to an argument to which the counsel alluded, this other employee, one year later got a 14-day suspension. In effect, it's irrelevant. There's no way that Ms. Ellis could have known in May 2008 when she decided on the penalty of removal what was going to happen a year later with someone else. And then the arbitrator, what he did is, even if it was appropriate to compare them, the degree of deception was so different. The other employee admitted right away and expressed remorse. He could have been rehabilitated. Here, given her repeated intentional fraudulent activity and lies to any number of people, there was no potential for rehabilitation. So that basically, under Ward, the notice of proposed removal at pages 52 to 58 of the appendix, it is extremely thorough. She never contested any of the underlying facts, which do go to the penalty, given the seriousness of the offense. And if there are no further questions, we would respectfully request that the Court affirm. Okay, thank you, Ms. Vann. You have a little more than four minutes. First of all, I'm going to amend my answer that I made to Judge Prost. It is a factual approach. I'm sorry. My name is mispronounced often. The question of whether there's a workplace shortage or not is a fact. And Ms. Ellis, who is a very hands-on manager, I've talked to her in hearings, knew herself from her own experience, her own knowledge, whether or not this created a workplace shortage. And the Board, in one of its decisions following Ward, pointed out that the principle in Ward is not just ex parte contacts. In one of the cases, the deciding official knew that the employee had had a bad record otherwise and used that in making this decision. The answer, Judge Prost, to the question of isn't coercion different from inconvenience of people? Yes. And if these things don't matter, why were they used? I mean, this could have been an easy case. This could have been a simple case. You acted dishonestly, and we fire people who act dishonestly. Or it could be you submitted false medical documentation, and we always fire people who do that. This is a Social Security Administration. Now, it becomes complicated in part by the fact that obviously they don't fire people simply for repeatedly, nine or ten times in the other case, using documentation. They weigh the reasons. In the earlier case, Ms. Ellis weighed the facts, didn't recite any mitigating factors, didn't talk about rehabilitation, but at least weighed the facts and decided a two-week suspension for repeatedly submitting forged documents was sufficient. We have no quarrel with that. In Ms. Ellis's case, I'm sorry, Ms. Williams-Carter's case, Ms. Ellis had to go through the same process. Presumably she did, and in her head, at least, decided on, for example, the fact that Ms. Williams-Carter was consciously attempting to intimidate people, it does weigh in favor of discharge. But it's simply not a reason that we were told when the proposal was made or even when the decision was made. And that rises to the point of unconstitutional unfairness. They can't rely on reasons that we're not notified of. And the mere fact that we have facts, you sent an email to the commissioner, which could be interpreted as inconveniencing the commissioner, could be interpreted as intimidating the commissioner or attempting to use him to intimidate lower management, that does not state a reason. Otherwise, all you have to do is give you, here's the Encyclopedia Britannica. You'll find the reasons for your discharge in it. There's facts all over the place from which one could infer, possibly, that you did something wrong. Again, it's this thing of you sent an email to the commissioner. I can't remember the line from Shakespeare, but it's looking at clouds. Oh, I see a cat. I see a house. That's not enough. That doesn't state the reason. That's all I can say. Thank you, Mr. Chief.